**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

PAUL D. HICKS,

    Plaintiff,

v.                                          CASE NO. 06-CV-15494

COMMISSIONER OF                             DISTRICT JUDGE ANNA DIGGS TAYLOR
SOCIAL SECURITY,                            MAGISTRATE JUDGE CHARLES E. BINDER

    Defendant.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.  RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled.  Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

### II.  REPORT

#### A.  Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this Magistrate Judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for disability insurance benefits.  This matter is currently before the Court on Defendant's motion for summary judgment.  (Dkts. 13, 16.)

Plaintiff was 40 years of age on the date of his alleged disability, and 42 years of age on the date of the Administrative Law Judge's decision. (Tr. at 17, 309.) He has a high school education with vocational education thereafter. (Tr. at 310.) Plaintiff's relevant work history includes work as a broach operator and as a janitor for an automotive-related company. (Tr. at 51, 57-59.)

Plaintiff filed the instant claim on August 26, 2006, alleging that he became unable to work on December 12, 2003. (Tr. at 50-51.) The claim was denied at the initial administrative stages. (Tr. at 26, 29-33.) In denying Plaintiff's claim, the Defendant Commissioner considered symptomatic HIV infection and asthma as possible bases of disability. (*Id.*) On April 10, 2006, Plaintiff appeared with counsel before Administrative Law Judge ("ALJ") Bert C. Hoffman, Jr., who considered the case *de novo*. In a decision dated July 24, 2006, the ALJ found that Plaintiff was not disabled. (Tr. at 10-18.) Plaintiff requested a review of this decision on September 18, 2006. (Tr. at 7.)

The ALJ's decision became the final decision of the Commissioner on October 20, 2006, when the Appeals Council denied Plaintiff's request for review. (Tr. at 4-6.) On December 12, 2006, Plaintiff filed *pro se* the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Dkt. 1.)

**B.     Standard of Review**

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited to determining whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner's decision employed the proper legal standards. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997); *Brainard v. Sec'y of Health & Human Servs.*,

889 F.2d 679, 681 (6th Cir. 1989) (per curiam). The Commissioner is charged with finding the facts relevant to an application for disability benefits. A federal court "may not try the case *de novo* . . . ." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

If supported by substantial evidence, the Commissioner's decision is conclusive, regardless of whether the court would resolve disputed issues of fact differently, *Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028 (6th Cir. 1990), and even if substantial evidence would also have supported a finding other than that made by the ALJ. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc). The scope of the court's review is limited to an examination of the record only. *Brainard,* 889 F.2d at 681. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 681 (citing *Consolidated Edison Co. v. NLFB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 2d 126 (1938)). The substantial evidence standard "'presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference from the courts.'" *Mullen*, 800 F.2d at 545 (quoting *Baker v. Heckler*, 730 F.2d 1147, 1149 (8th Cir. 1984)) (affirming the ALJ's decision to deny benefits because, despite ambiguity in the record, substantial evidence supported the ALJ's conclusion).

The administrative law judge, upon whom the Commissioner and the reviewing court rely for fact finding, need not respond in his or her decision to every item raised, but need only write to support his or her decision. *Newton v. Sec'y of Health & Human Servs.*, No. 91-6474, 1992 WL 162557 (6th Cir. July 13, 1992) (unpublished). When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y*

*of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Anderson v. Bowen*, 868 F.2d 921, 924 (7th Cir. 1989) ("a written evaluation of every piece of testimony and submitted evidence is not required"); *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987) (ALJ need only articulate his rationale sufficiently to allow meaningful review). Significantly, under this standard, a reviewing court is not to resolve conflicts in the evidence and may not decide questions of credibility. *Garner,* 745 F.2d at 387-88.

**C. Governing Law**

In enacting the social security system, Congress created a two-tiered system in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination which can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen*, 800 F.2d at 537.

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). "[B]enefits are available only to those individuals who can establish 'disability' within the terms of the Social Security Act." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). "Disability" means:

4

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). One is thus under a disability "only if his physical or mental . . . impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

A claimant must meet all five parts of the test set forth in 20 C.F.R. § 404.1520 in order to receive disability benefits from Social Security. The test is as follows:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments, benefits are denied without further analysis.
>
> Step Three: If the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled without further analysis.
>
> Step Four: If the claimant is able to perform his or her previous work, benefits are denied without further analysis.
>
> Step Five: If the claimant is able to perform other work in the national economy, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Garcia v. Sec'y of Health & Human Servs.*, 46 F.3d 552, 554 n.2 (6th Cir. 1995); *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 687-88 (6th Cir. 1985). "The burden of proof is on the claimant throughout the first four steps of this process to prove that he is disabled." *Preslar*, 14 F.3d at

1110. "If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Id.* "Step five requires the [Commissioner] to show that the claimant is able to do other work available in the national economy. . . ." *Id.*

### D. Administrative Record

Evidence contained in the administrative record and presented to the ALJ indicates that in June of 1997 Plaintiff was found to be HIV positive (Tr. at 111-112, 237-242.) X-rays taken of Plaintiff's lungs at that time were clear. (Tr. at 232.) Thereafter he was regularly seen by physicians at Henry Ford Hospital until November 2003, about one month prior to the date Plaintiff claims he became disabled. (Tr. at 87-242.) In late August 1997, the physicians noted that except for the diagnosis of HIV, Plaintiff reported that he felt well, with his primary complaints being a rash and loss of hair. (Tr. at 216, 212.) No weight loss, fever, or chills were seen. (*Id.*) In September 1997, Plaintiff's physicians x antiretroviral therapy. (Tr. at 210.) Plaintiff expressed his willingness to begin this therapy, "although he is surprised that he is that advanced considering the fact that he feels well [.]" (*Id.*)

In March 1998, Plaintiff was seen for a follow-up examination. He denied having any complaints, and his physician stated that he "has been doing very well" regarding his appetite, although weight loss was seen. (Tr. at 201.) A "marked improvement" in his skin condition was also seen. (*Id.*) In early June 1998, Plaintiff was again seen and stated that he was "doing all right" with his only complaint being that of insomnia. (Tr. at 198.) No significant weight change was seen at that time. (*Id.*) In mid-October 1998, Plaintiff returned and reported no new complaints. (Tr. at 192.) Plaintiff's viral load and CD4 count were both somewhat greater than values measured in March. (*Id.*, Tr. at 198.) In late November 1998, Plaintiff returned a routine

6

follow-up exam and reported no new problems. (Tr. at 190.) Plaintiff's viral load was decreased from previous measurements, but his CD4 count showed an increase. (*Id.*)

In early March 1999, Plaintiff returned for another routine follow-up examination. His physician stated that he was "subjectively feeling well without complaints." (Tr. at 188.) Plaintiff's heart and lungs were normal and Plaintiff appeared well-hydrated. (*Id.*) Plaintiff's viral load and CD4 showed increased values. (*Id.*) In late June 1999, Plaintiff returned for treatment of a skin lesion on his scalp. (Tr. at 186.) It was noted that the condition of Plaintiff's skin had worsened and that he had run out of this medication. (*Id.*)

In early September 1999, Plaintiff was seen at the Henry Ford Hospital emergency room for complaints of low back pain. (Tr. at 184.) The examining physicians noted that Plaintiff's gait was normal and physical examination detected no abnormalities. (*Id.*) Some tenderness in the lower spine was seen as was some muscle spasm. (Tr. at 185.) Plaintiff was discharged with instructions. (*Id.*)

In early November 1999, Plaintiff returned for a routine follow-up visit. (Tr. at 183.) Plaintiff was doing "all right" and made no major complaints. (*Id.*) Plaintiff admitted that he had not taken his medications for over two weeks. (*Id.*) Physical examination was normal and revealed that Plaintiff had gained weight. (*Id.*) Viral load and CD4 measurements were both decreased. (*Id.*) Plaintiff returned a few days later for treatment of skin lesions. (Tr. at 181.) Biopsies were taken. (*Id.*) In mid-December 1999, Plaintiff's skin lesions were treated and medications were given. (Tr. at 179.)

In late March 2000, Plaintiff was seen at the Henry Ford Hospital emergency room for pain in the left ear. (Tr. at 177.) Physical examination was normal and Plaintiff denied experiencing any dizziness, lightheadedness, vertigo or hearing loss. (*Id.*) Plaintiff's cranial

7

nerves were intact, orthopedic tests were negative, and muscle strength was normal in all extremities. (Tr. at 178.) Plaintiff was released with directions to follow up with his infectious disease physician. (*Id.*)

In late July 2000, Plaintiff returned to the Henry Ford Hospital emergency room, again complaining of ear problems. (Tr. at 173.) Plaintiff denied any loss of hearing. (*Id.*) Plaintiff also complained of skin lesions. Plaintiff's ears were irrigated and the right ear canal appeared irritated. (Tr. at 174.) Plaintiff was given ear drops as well as skin cream and was discharged. (Tr. at 175.)

In late December 2000, Plaintiff was again seen for a routine follow-up visit. (Tr. at 168.) Plaintiff stated that he "has been doing fairly well and has no new complaints to report today." Plaintiff admitted that he missed dosages of his medications "a good number of times." (*Id.*)

In late January 2001, the day after beginning new medications, Plaintiff was seen at the Henry Ford Hospital emergency room for complaints of numbness and irritability in the knees and ankles. (Tr. at 160.) Plaintiff was given anti-inflammatory medications and arrangements to see his infectious disease physician were made. (Tr. at 161.) Plaintiff was seen two days later and his medications were adjusted. (Tr. at 157.) In late February 2001, Plaintiff was seen for another routine follow-up visit. He again stated that he was doing "fairly well," had no new complaints and was adapting to his medications. (Tr. at 155.) Plaintiff's viral load was decreased and his CD4 count had increased from previous measurements. (Tr. at 156, 168.)

In February 2001, Plaintiff was seen in the Henry Ford Hospital emergency room for complaints of intermittent left-sided groin pain. (Tr. at 149.) Plaintiff was diagnosed with a probable skin irritation and muscle strain in the left groin. (Tr. at 150.) In late May 2001,

8

Plaintiff was seen at the Henry Ford Hospital emergency room for complaints of skin irritation and itching. (Tr. at 142.) Physical examination was normal and some skin lesions were seen. (Tr. at 143.) The examining physician suspected an allergic reaction to antihistamine medications and prescribed different medications. (*Id.*)

Subsequent to the date of his claimed disability, Plaintiff saw physicians at the Virginia Park Medical Clinic. In early June 2004, a slight cough was reported, but with no shortness of breath. (Tr. at 237.) Examination of Plaintiff's heart and extremities was again apparently normal. (Tr. at 238-39.) In early September 2004, Plaintiff stated that he missed a previous referral visit. (Tr. at 236.) Examination of Plaintiff's heart and extremities was again apparently normal. (*Id.*)

In mid-October 2004, Plaintiff was examined at the request of the Disability Determination Service by Dr. Patel. The doctor. reported that Plaintiff exhibited normal range of motion in his cervical spine, shoulders, elbows, hips, ankles, wrists, and fingers. (Tr. at 244.) Plaintiff could bend forward 80 of the normal 90 degrees. (*Id.*) Plaintiff's lungs were said to be clear and Plaintiff's heartbeat was normal. (*Id.*) His gait was described as normal and no tenderness was seen during examination of his spine. (*Id.*) The doctor noted that Plaintiff had not had a recent eye examination, and that he would likely benefit from steroid inhaler medications. (*Id.*)

In mid-February 2005, Plaintiff's treating physician noted that his HIV condition was asymptomatic and that Plaintiff was compliant with his medications. (Tr. at 292.) No history of psychiatric illness was reported. (Tr. at 285.) No significant weight change was reported. (Tr. at 286.) Plaintiff was reported to have had blurred vision in the left eye since childhood, but glasses were not necessary. (*Id.*) No cardiac or respiratory abnormalities were seen during

9

this examination. (Tr. at 286-287.) No muscular, skeletal or neurological abnormalities were seen. (Tr. at 287.) Plaintiff exhibited a normal gait, and no abnormalities of the spine or extremities were noted. (Tr. at 290.)

In late April 2005, Plaintiff was seen for complaints of diarrhea. (Tr. at 281.) No fever or chills were found nor did Plaintiff complain of abdominal pain. (*Id.*) No coughing was present and Plaintiff was found to have lost four pounds. (*Id.*) Plaintiff's CD4 count was described as "good." (Tr. at 265.) In late July 2005, Plaintiff's treating physician stated that he had "progressed well since last visit [.]" (Tr. at 268.) The doctor indicated that Plaintiff had occasional diarrhea, but no fever. (Tr. at 267.) Between April and July 2005, Plaintiff's viral load had decreased from 15,000 to 2,000, and the CD4 count also showed a slight decrease. (Tr. at 270.) In November 2005, it was noted that his viral load had dropped to 300. (Tr. at 278.) Plaintiff failed to make a January 2006 appointment, a February 2006 appointment, and canceled a March 2006 appointment, scheduled about xx. (Tr. at 275-78.)

### E. ALJ's Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability. (Tr. at 15.) At step two, the ALJ found that Plaintiff's impairments were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 16.) At step four, the ALJ found that Plaintiff could not perform his previous work. (Tr. at 17.) At step five, the ALJ, using the Medical-Vocational Rules,

concluded that Plaintiff retained the ability to undertake a wide range of light exertion work. (Tr. at 18.)

### F. Review of ALJ's Determination

#### 1. Legal Standards

The ALJ found that Plaintiff possessed the residual functional capacity to return to light exertion work. (Tr. at 18.) Light work is defined by the Commissioner, for grid purposes, as follows:

> Light Work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether or not substantial evidence supports the ALJ's decision.

#### 2. Substantial Evidence

Plaintiff in effect argues that he qualifies for benefits. In this circuit, if the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

After review of this record, I suggest that substantial evidence supports the Commissioner's findings. In finding Plaintiff not disabled, the ALJ considered at some length whether the Plaintiff's HIV condition met or equaled the Commissioner's Listing of Impairments. Step three of the Commissioner's disability analysis looks to the listed impairments of the Appendix. Section 14.00 of the Appendix covers impairments of the immune system. The level of severity of HIV required to meet the listing is described in 14.00D:

> The HIV infection is caused by a specific retrovirus and may be characterized by susceptibility to one or more opportunistic diseases, cancers, or other conditions. . . Any individual with HIV infection, including one with a diagnosis of Acquired Immune Deficiency Syndrome ["AIDS"], may be found disabled under this listing if his or her impairment meets any of the criteria in 14.08 or is of equivalent severity to any impairment in 14.08.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 14.00(D)(1).

> Listing 14.08 also provides as follows:
>
> Human immunodeficiency virus (HIV) infection. With documentation as described in 14.00D3 and one of the following: . . .
>
> I. HIV wasting syndrome, characterized by involuntary weight loss of 10 percent or more of baseline (or other significant involuntary weight loss, as described in 14.00D2) and, in the absence of a concurrent illness that could explain the findings, either:
>
> 1. Chronic diarrhea with two or more loose stools daily lasting for 1 month or longer; or
>
> 2. Chronic weakness and documented fever greater than 38°C (100.4°F) for the majority of 1 month or longer.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 14.08(I).

Listing 14.08N goes on to require proof of HIV infection and repeated manifestations of HIV infection resulting in significant, documented symptoms such as fatigue, fever, weight

12

loss, night sweats and one of the following at a marked level: restrictions of daily activities, difficulties in maintaining social functioning, or difficulties in completing tasks in a timely manner due to deficiencies in concentration, persistence or pace. *See* 20 C.F.R., Part 404, Subpt. P., App. 1, § 14.08N. For HIV-infected individuals evaluated under 14.08N, listing level severity is to be evaluated in terms of the functional limitations imposed by the impairment.

The ALJ, I suggest, correctly concluded that Plaintiff's condition did not meet or equal the Listing. Although some weight loss was reported, it did not approach that required by the Listing. (Tr. at 198, 281, 286.) In addition, although Plaintiff suffered periods of diarrhea, its length and severity failed to meet those required of the Listing. (Tr. at 267.) The record contains no evidence of either a persistent fever or the chronic weakness required by the Listing.

In making the determination at step five, the Commissioner can carry the burden by the use of the grid or by expert testimony. In many cases, use of the grid may direct a finding of "disabled" or "not disabled" based on the claimant's age, education, and transferable work skills. 20 C.F.R. § 416.969; *Born v. Sec'y of Health & Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990). If any of the findings of fact do not exactly coincide with the grid's definitions, the grid is used only as a guide. *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981). *See also* 20 C.F.R. § 416.969. In cases where the grid is not used to direct a finding of "disabled" or "not disabled," expert testimony is required to satisfy the Commissioner's burden of proof at step five. *Kirk*, 667 F.2d at 531.

On this record, I suggest that the ALJ properly applied the Grids, and that substantial evidence supports his findings as to Plaintiff's residual functional capacity. The record contains consistent notations that Plaintiff was feeling "well" or "all right." (Tr. at 155, 168, 183, 188, 192, 198, 201, 212, 216, 268.) In fact, in February 2005, Plaintiff's HIV condition was

described as "asymptomatic." (Tr. at 292.) With regard to Plaintiff's physical capacities, both Plaintiff's treating physicians and the Commissioner's examining physician found Plaintiff's gait to be normal, and he exhibited no weakness in the extremities. (Tr. at 178, 184, 238-39, 244, 287, 290.) It is significant, I suggest, that as correctly noted by counsel for the Commissioner, none of Plaintiff's treating physicians ever placed limitations upon his physical exertion.

The ALJ failed to find Plaintiff's complaints of disabling limitations fully credible. In the present case, the ALJ acknowledged that Plaintiff had an impairment that could cause limitations; however, he found that the severe and debilitating nature of Plaintiff's alleged limitations were not fully credible and provided reasons for this conclusion. The issue is whether the ALJ's credibility determinations are supported by substantial evidence. When weighing credibility, an ALJ may give less weight to the testimony of interested witnesses. *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982) ("a trier of fact is not required to ignore incentives in resolving issues of credibility."); *Krupa v. Comm'r of Soc. Sec.*, No. 98-3070, 1999 WL 98645 at **3 (6th Cir. Feb. 11, 1999) (unpublished). An ALJ's findings based on the credibility of an applicant are to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing a witness's demeanor and credibility. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Under this standard, I suggest that there is insufficient basis on this record to overturn the ALJ's credibility determination.

Accordingly, I suggest that the record contains substantial evidence supporting the ALJ's decision and, therefore, after review of the record, I conclude that the ALJ's decision, which ultimately became the final decision of the Commissioner, is within that "zone of choice within

which decisionmakers may go either way without interference from the courts." *Mullen*, 800 F.2d at 545.

### III. REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

                                                s/ *Charles E. Binder*
                                                CHARLES E. BINDER
Dated: November 5, 2007                    United States Magistrate Judge

**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date, electronically served on James A. Brunson and the Commissioner of Social Security, served on Paul Hicks by first class mail, and on District Judge Anna Diggs Taylor in the traditional manner.


Date: November 5, 2007            By      s/Patricia T. Morris
                                  Law Clerk to Magistrate Judge Binder